**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **IVAN JOHNSON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3: 18-CV-1476-MAB** |
| | ) | |
| **SCOTT THOMPSON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

This case is before the Court on a Motion for Summary Judgment, filed by Defendant James Groves, Larue Love, Christopher Thompson, and Chad Wall (Doc. 80), all of whom are or were employees of the Illinois Department of Corrections. Plaintiff, Ivan Johnson, filed a Response in Opposition (Doc. 86). The Defendants did not file a reply brief. For the reasons outlined below, the Defendants' motion is denied in part and moot in part.

**Procedural Background**

Plaintiff filed this lawsuit on August 8, 2018 (Doc. 1). Plaintiff's complaint was screened pursuant to 28 U.S.C. § 1915A to filter out non-meritorious claims and he was permitted to proceed on the following claims against the following individuals:

> **Count 1**: Eighth Amendment deliberate indifference claim against John Doe #1 Sergeant, Wall, and Love, for failing to protect Plaintiff from attack by his cellmate, despite their knowledge of the cellmate's aggressive behavior, mental illness, and history of violence;

> **Count 2**: Eighth Amendment deliberate indifference claim against Thompson in his official capacity, for maintaining cell assignment policies that place inmates in danger of physical harm.

(Doc. 6). Plaintiff's claim in Count 2 was permitted to proceed against Thompson (who was the Warden at that time) in his official capacity because Warden Thompson would have been the appropriate official to carry out any injunctive relief ordered by the Court (*See* Doc. 6).

The John Doe Sergeant in Count 1 was later identified as James Groves (Doc. 20). The case proceeded through discovery (exhaustion was never an issue) and after the close of discovery, Defendants moved for summary judgment (Doc. 80). Plaintiff responded in opposition to Defendants' motion for summary judgment and also filed a motion to dismiss certain claims that, with the benefit of discovery, presumably lacked any evidentiary support (*See* Doc. 85). Specifically, Plaintiff moved to dismiss Count 2 against Warden Thompson and what Plaintiff described as Count 3, a preliminary injunction (Doc. 85).

The Court granted the motion pursuant to its inherent authority (Doc. 87). With the benefit of hindsight, and a careful evaluation of the record, the Court discovered that the 1915A Screening Order did not categorize Plaintiff's request for a preliminary injunction as a standalone count (*See* Doc. 6.). While its true that Plaintiff's pro se complaint advanced a count for preliminary injunction, the Screening Order noted that Plaintiff did not actually file a motion seeking such relief and thus took no action on the request (*See* Doc. 6, p. 3). The Court offers this aside simply to clarify the record. Suffice to say, Plaintiff dismissed Count 2, which was an official capacity claim against the

Warden. There was never a Count 3 to dismiss. And thus the only claim at issue now is Plaintiff's Eighth Amendment failure to protect claim against Scott Groves, Chad Wall, and Larue Love.[1]

## Factual Background

Plaintiff, Ivan Johnson, is an inmate, currently incarcerated at Menard Correctional Center. This case concerns an altercation, or according to Plaintiff – an attack – while Plaintiff was housed at Pinkneyville Correctional Center with an inmate named Semaj Dunn. Plaintiff says he warned the Defendants that his cellmate (Mr. Dunn) was exhibiting abnormal behavior, that he did not feel comfortable in his cell with him, that the situation was urgent, and that he needed to be moved to a different cell. The attack on Plaintiff by Mr. Dunn resulted in six or seven stitches to Plaintiff's lip and ultimately this lawsuit.

### A. The Parties

The incident occurred on March 31, 2018 (Doc. 86-1, p. 5). Plaintiff was in segregation at that time, which was located in cellblock 5A at Pinkneyville (Doc. 86-1, p. 5). James Groves was a sergeant at Pinkneyville at that time (Doc. 86-2, p. 2). There is only one sergeant on duty per shift in the segregation unit, and he was the one working the day shift (Doc. 86-2). Chad Wall was working as a lieutenant in the segregation unit at Pinkneyville that day as well (Doc. 86-3, pp. 4-5). A lieutenant has supervisory authority

[1] Because of Plaintiff's decision to dismiss Count 2, this renders a substantial portion of the arguments in Defendants' motion for summary judgment moot. Specifically, Sections 3 and 4 of Defendants' Argument are no longer applicable in light of this dismissal and the Court will not address them (*See* Doc. 81, pp. 9-14).

over the correctional officers and the sergeant in the chain of command (Doc. 86-3, p. 5). Larue Love worked as the Assistant Warden of Operations at Pinkneyville on the day in question and in this role, reported directly to the Warden (Doc. 86-4, p. 5; 82-3, p. 2). As the Assistant Warden, Love was responsible for the safety and security of the facility for both staff and offenders, and was responsible for security of the departments, dietary, and maintenance (Doc. 82-3, p. 3).

**B. The incident and events leading up to it**

Plaintiff and Mr. Dunn first became cellmates on March 27, 2018 (Doc. 86-1, p. 8). They lived together in cellblock 5A (cell 54), which was the segregation unit at Pinkneyville (Doc. 86-1, pp. 7-8, 26-27). When the two first started living with one another, they got along okay as Plaintiff describes it, but he soon saw that Mr. Dunn had some "disturbed behaviors." (Doc. 86-1, p. 9). For example, within a day or two of living together, Plaintiff witnessed Mr. Dunn either attempt to or pretend as if he was about to commit suicide (Doc. 86-1, p. 10). Plaintiff saw Mr. Dunn rip some bed sheets, tie them together to make a noose, slip the noose around his neck and stand in the front of his cell waiting for a correctional officer to see him (Doc. 86-1, p. 10). According to Plaintiff, Mr. Dunn told him this was all "part of his plan" and to just leave him alone (Doc. 86-1, p. 10). Ultimately a correctional officer saw Mr. Dunn and he was taken out of the cell and placed on suicide watch (Doc. 86-1, p. 10). He returned back to the cell in a day or two (Doc. 86-1, p. 11).

During their time together, Plaintiff testified that Mr. Dunn also acted unusual in a variety of other ways. (Doc. 86-1, p. 12). For example, he beat on the door, he talked to

himself, he paced in the cell, was on psychiatric medicine, and he did not sleep (Doc. 86-1, p. 12). Plaintiff also testified about an unusual practice that Mr. Dunn would engage in where he, in essence, stood or hovered right over Plaintiff when he would be lying in bed on the bottom bunk (Doc. 86-1, p. 22).

On March 31st, Plaintiff told Sergeant Groves he was having issues with Mr. Dunn and gave him a kite to give to Lieutenant Wall (Doc. 86-1, pp. 16-17). When asked about the specifics of the conversation, Plaintiff said he told Groves the kite was "urgent" because it involved he and his cellmate and the two were not getting along in the cell (Doc. 86-1, p. 18). Mr. Dunn was in the cell at this time as well (Doc. 86-1, p. 18). Groves, for his part, has no recollection of this conversation with Plaintiff on March 31st, 2018 (Doc. 86-2, p.16). Groves does not dispute this conversation could have occurred; he simply does not recall it (Doc. 86-2, p. 16).[2]

Plaintiff also voiced his concerns to a mental health professional ("MHP") visiting the cell the morning of March 31st. Plaintiff told MHP Smith he was having real disturbing and life disturbing problems with Mr. Dunn (Doc. 86-1, p. 20). He recounted to Mr. Smith some of the specific concerns he had about Mr. Dunn including his bizarre behavior (*i.e.*, he wasn't sleeping, talking to himself) (Doc. 86-1, p. 20). Although Plaintiff did not say specifically, it appears his intent with this conversation was to get word about the urgent nature of his problem with Mr. Dunn to Lieutenant Wall and the Warden or Assistant Warden (Doc. 86-1, p. 20).

[2] Although Groves testified that he has nothing to do with inmate placement because that is handled by the lieutenant, he also acknowledged that if he believed an inmate was endangered or threatened by his cellmate, then he would be required to remove the inmate from that situation (Doc. 86-2, pp. 9, 16).

Later in the day around 11:30 or 12, Plaintiff spoke to Lieutenant Wall (Doc. 86-1, p. 21). He hollered for Lieutenant Wall from his cell, asking to speak with him and told him it was "urgent" because it concerned he and his cellmate (Doc. 86-1, p. 21). This conversation occurred during yard time and Mr. Dunn was out of the cell at yard (Doc. 86-1, p. 22). Plaintiff says he told Wall (once he came over to his cell) that he and Mr. Dunn are not getting along and that he did not feel comfortable being in a cell with him (Doc. 86-1, p. 22). He also told Wall some of the specifics that were making him feel uncomfortable (Doc. 86-1, p. 22).[3] Plaintiff indicated he was trying to stress the urgency of the situation and that it was a hostile environment and was not going to end well for him (Doc. 86-1, p. 22). As Plaintiff tells it, Wall said that what Plaintiff was reporting was not enough for him to move Plaintiff out of the cell with Mr. Dunn (Doc. 86-1, p. 23).[4]

At around 1:00 or 1:30, Plaintiff then spoke with Assistant Warden Love (Doc. 86-1, p. 26). According to Plaintiff, he saw Love on the wing from his cell and asked to speak with him (Doc. 86-1, p. 26.). He told Love who he was and that he was having "real life disturbing problems" with his cellmate (Doc. 86-1, p. 27). Plaintiff provided details to Love to try and explain why this was a very real problem and why Plaintiff needed to be moved out of his cell as soon as possible (Doc. 86-1, p. 27). He also told Love specifics

---

[3] According to Plaintiff, he told Wall that Mr. Dunn was "SMI" (serious mental illness). Plaintiff says Mr. Dunn told him he was SMI (which Defendants never disputed). Plaintiff also told Wall that Dunn beat on the door; talks to himself; and that he hovers over Plaintiff's head all during the day and night and that this was making Plaintiff uncomfortable (Doc. 86-1, pp. 22, 35).

[4] Wall, for his part, does not recall the incident on March 31, 2018 and does not recall receiving any complaints from Plaintiff beforehand (Doc. 86-2, p. 25). However, Wall does not dispute that he would have been responsible for determining whether Plaintiff and Mr. Dunn should be cellmates on that day (Doc. 86-3, p. 13).

about Mr. Dunn's disturbing behavior. He noted that Mr. Dunn was SMI, that he was beating on the door, hovering over Plaintiff while he was lying in bed, not sleeping, and that he felt like his "life was in danger" and needed to be moved urgently (Doc. 86-1, p. 27). According to Plaintiff, Love said he will see what he can do (Doc. 86-1, p. 27). When Love was asked about this interaction, he testified that he has no memory of anyone complaining to him on March 31st, 2018 (Doc. 82-3, p. 5).

Sometime after evening chow (which is around 4:00 p.m.), Mr. Dunn attacked Plaintiff in the cell (Doc. 86-1, p. 28). Plaintiff was attempting to move past Mr. Dunn in the cell to put his chow tray by the door and Mr. Dunn shoved him or shoulder bumped him and then punched him in the face (Doc. 86-1, p. 28). Plaintiff says that after the punch, he grabbed Mr. Dunn to try and calm him down, and does not recall striking him back (Doc. 86-1, p. 28). After he released Mr. Dunn from what he described as a bear hug, Mr. Dunn starting kicking the door and yelling (Doc. 86-1, p. 28). A lieutenant came to the cell and separated the two (Doc. 86-1, p. 30). Plaintiff ultimately received six or seven stitches in his upper lip as a result of the attack from Mr. Dunn. He described the punch as a "nice little punch" on him. He also received medication for his pain such as ibuprofen (Doc. 86-1, p. 31).[5] Ultimately, both Plaintiff and Mr. Dunn received tickets for fighting.[6]

---

[5] The Offender Disciplinary Report, which was completed by Correctional Officer Bennett, tells a different story. According to the Report, Plaintiff and Mr. Dunn both stated they "exchanged closed fist punches around 3:15 p.m. inside the cell." (Doc. 82-4). According to Mr. Dunn, the altercation occurred because Plaintiff was trying to "control the cell" and according to Plaintiff, he was not sure why they fought, but Mr. Dunn was "messed up in the head" and things got heated. The Report notes that both Plaintiff and Mr. Dunn sustained injuries consistent with a fight having occurred (Doc. 82-4). However, it does not elaborate any further on this, explain what injuries Mr. Dunn incurred, if any, or why it was consistent with a fight having occurred.

[6] Plaintiff's brief cites to Exhibit E (Disciplinary Card of Mr. Dunn); Exhibit F (Disciplinary Card of Mr. Johnson); and Exhibit G (e-mail from C/O Bennett) (*See* Doc. 86). However, Plaintiff did not attach any of

In short, Plaintiff indicated he told Groves, Wall, and Love that he was uncomfortable with his cellmate; that his cellmate was exhibiting disturbing behavior; that the situation in the cell was a real problem; that he needed to be moved as soon as possible; and that Mr. Dunn doesn't sleep (Doc. 86-1, p. 36-37). And Plaintiff specifically told Love that he believed his life was in danger (Doc. 86-1, p. 37) and he told Wall and Groves the situation with his cellmate was urgent and he needed to be moved (Doc. 86-1, pp. 21-23, 36-37). For the Defendants' part, none of them can recall these conversations and the Offender Disciplinary Report, which is fairly perfunctory, seems to suggest it was a two person fight rather than an unprovoked attack by Mr. Dunn (Doc. 82-4).

**Discussion**

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting

---

these exhibits to his brief or indicate where they might be located on the docket. Therefore the Court was unable to review or rely on them. In any event, it appears from Plaintiff's summary of these exhibits they would only further demonstrate that there are a multitude of factual disputes surrounding the attack on Plaintiff by Mr. Dunn. And for the purpose of summary judgment, the construes the facts in the light most favorable to Plaintiff.

evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen,* 763 F.3d at 836.

"The Eighth Amendment's prohibition on 'cruel and unusual punishments' obligates prison officials to 'take reasonable measures to guarantee the safety of . . . inmates.'" *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). In particular, prison officials are required "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. In order to establish an Eighth Amendment violation based on a failure to protect, an inmate must show that the prison official was deliberately indifferent to "an excessive risk" to their health or safety. *Sinn*, 911 F.3d at 419 (quoting *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015)). Like all deliberate indifference claims, there is both an objective and subjective component. *Gevas*, 798 F.3d at 480. First, the prisoner must show that the harm to which they were exposed was objectively serious. *Id*. Second, the prisoner must show that the prison official knew of and disregarded the excessive risk to the inmate's health or safety. *Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020). This requires "actual, and not merely constructive, knowledge" of the risk of harm, meaning the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Gevas*, 798 F.3d at 480 (quoting *Farmer*, 511 U.S. at 837). In deciding whether the prison official was aware of the risk, "the

circumstances as a whole must be considered." *LaBrec v. Walker*, 948 F.3d 836, 843 (7th Cir. 2020).

**A. Actual Knowledge**

Defendants argue that they are entitled to summary judgment because Plaintiff cannot demonstrate Defendants had "actual knowledge" of an impending harm to Plaintiff from his cellmate. However, before addressing this argument, the Court notes that Defendants make no mention of or reference to the objective prong of Plaintiff's deliberate indifference claim. Defendants' silence on this subject leads the Court to conclude that they have conceded the harm and injuries Plaintiff suffered (*i.e.* six or seven stitches) was objectively serious. *See Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) ("a beating suffered at the hands of a fellow detainee, such as that alleged by [plaintiff], clearly constitutes serious harm").

Defendants' argument regarding their lack of actual knowledge is somewhat cursory in nature and it is also a nonstarter because it minimizes Plaintiff's testimony and fails to fully account for and credit his story and construe the evidence in the light most favorable to him (*See* Doc. 81, p.8).[7] As outlined above, Plaintiff first told Sergeant Groves that he and Mr. Dunn were not getting along, the matter was urgent, and that he needed to be moved as soon as possible (Doc. 86-1, pp. 16-17, 36-37). He also gave Groves a kite (a written message) to give to Lieutenant Wall about the urgent problem he was having with Mr. Dunn (Doc. 86-1, pp. 16-17). Plaintiff voiced very specific concerns to Wall that

[7] Defendants' brief dedicates a paragraph to discussing *Riccardo v. Rausch*, 375 F.3d 521 (7th Cir. 2004) (*See* Doc. 81, p. 7). But its unclear to the Court why Defendants discuss this case and what application, if any, it has to the case at hand. The connection to this case is simply never made.

he and his cellmate were not getting along, he needed to be moved and that it was a hostile environment, unlikely to end well for him (Doc. 86-1, pp. 21-23, 36-37). And finally, Plaintiff spoke to Warden Love and raised concrete concerns about his safety and specifically told Love he feared that his life was in danger. (Doc. 86-1, pp. 26-27, 36-37). All three of these individuals (even Groves) acknowledged that if there was a credible concern about an inmate's safety from his cellmate, each Defendant had the power and authority to move Plaintiff out of the situation.

"[A] complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Gevas v. McLaughlin*, 798 F.3d 475, 481 (7th Cir. 2015); *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (in failure to protect cases, a prisoner normally can establish actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety). Here, while Plaintiff's conversations may have differed with each of the three Defendants, he testified that he told each one of them he was having real life disturbing problems with his cellmate, that his cellmate was exhibiting strange behavior, that the situation was urgent, and in one instance, that he feared for his life. Defendants have not made any suggestion that Plaintiff was not credible or that he was a known fabricator. Crediting Plaintiff's story as true (which the Court must for the purpose of summary judgment), he very clearly conveyed the imminence and urgency of the situation to each Defendant. And he identified the prospective assailant to each Defendant. Although Plaintiff did not specifically say he feared Mr. Dunn was going to

punch him in his face, the details, according to Plaintiff, are specific enough to give the Defendants actual knowledge of an imminent threat of a physical attack on Plaintiff by Mr. Dunn.

None of the Defendants recall their conversation with Plaintiff on that day in question, which is not surprising given the lapse in time (Docs. 82-3, p. 5; 86-2, p. 16; 86-3, p. 25). The Offender Disciplinary Report seems to suggest that officials at Pinkneyville determined the incident to be a mutual altercation between Plaintiff and Mr. Dunn, but there is no real explanation as to why this determination was made (Doc. 82-4). In any event, these factual disputes cannot be resolved at the summary judgment stage. *See Hansen*, 763 F.3d at 836 (the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party).

In sum, a reasonable juror, crediting Plaintiff's testimony, could conclude that each of the Defendants had actual knowledge of a specific and imminent threat to Plaintiff's safety, posed by his cellmate. Summary judgment on the basis of actual knowledge (or lack thereof) is simply not appropriate. *See Haley v. Gross*, 86 F.3d 630, 643 (7th Cir.1996) (prisoner advised sergeant, *inter alia,* that cellmate was intimidating him, acting strangely, had threatened that "something crucial was going to happen" if one of them was not moved, and was now "deadlocked" in cell, which restricted ingress to and egress from cell).

**B. *Heck v. Humphrey* and its application, if any, to Plaintiff's claim**

Defendants contend that Plaintiff's claim is barred by the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held that a state prisoner cannot proceed on claims for money damages under 42 U.S.C. § 1983 based on an allegedly unconstitutional conviction or sentence unless the prisoner demonstrates that the conviction or sentence has been invalidated. *Heck,* 512 U.S. at 486–87. *Heck* applies both to a prisoner's original conviction and sentence and to parole revocations. *Easterling v. Siarnicki*, 435 Fed. App'x. 524, 526 (7th Cir. 2011) (citing *Wilkinson v. Dotson,* 544 U.S. 74, 81–82 (2005)).

Defendants point this Court to a case they say is similar and persuasive - *Chencinski v. Reeder*, 2013 WL 2383637, at *4 (S.D. Ill. May 30, 2013). This case involved a First Amendment retaliation claim and a Due Process claim, both of which were dismissed by the district court on the basis of *Heck*. In *Chencinski*, the plaintiff alleged that he received a false disciplinary ticket as a means of retaliation for filing grievances. *Id*. at * 1. He also claimed he was denied due process at his adjustment committee hearing because he was not afforded an impartial investigation, an opportunity to put on a defense, and that the adjustment committee relied on confidential informants without an inquiry into their reliability. *Id*.

The plaintiff was found guilty at the adjustment committee hearing and the district court ultimately concluded that Plaintiff's claim was *Heck* barred because "[a] finding that the disciplinary ticket was issued falsely or that the hearing denied Plaintiff due

process, would, if established, necessarily imply the invalidity of the hearing's result." *Id.* at *4. The Court fails to see how *Chencinski* has any application to the instant case. Plaintiff's claim is an Eighth Amendment claim for deliberate indifference for failing to protect Plaintiff from an attack by his cellmate, which is markedly different than the claims at issue in *Chencinski* (First Amendment Retaliation and Due Process).

Moreover, Plaintiff seeks money damages from the Defendants for their alleged failure to protect him from an attack by his cellmate (*See* Doc. 1, p. 11; Doc. 6). Plaintiff does not seek to expunge the disciplinary ticket he received nor is he challenging the disciplinary process in general. In fact, nothing about this case challenges the validity of the ticket he received, the disciplinary process that ensued, or the discipline he ultimately received. Plaintiff seeks money damages as a result of the injuries he sustained because of the alleged constitutional violations. Neither *Heck* nor *Chencinski* have any application to the instant case. Accordingly, summary judgment on this basis is not warranted.[8]

**C. Qualified Immunity**

In light of the Court's conclusion that Defendants are not entitled to summary judgment on Count 1, the Court must consider their argument that they are protected by qualified immunity.

"Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d

[8] As noted *supra* (n. 1), Plaintiff has dismissed Count 2 against Warden Thompson, which concerned injunctive relief. As a result, the Court need not address Defendants' arguments concerning this claim and will thus move to Defendants' final argument, which is qualified immunity.

906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In determining whether Defendants are entitled to qualified immunity, the Court must ask two questions: (1) whether the facts, taken in the light most favorable to Vega, show that Defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Hernandez*, 634 F.3d at 914 (citing *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001)).

The Court has already determined that Plaintiff put forth sufficient evidence to establish a genuine issue of fact as to whether his Eighth Amendment right to be free from cruel and unusual punishment was violated. Thus, the only remaining issue is whether that right was clearly established. The Court concludes that it was at the time of the incident. In *Farmer v. Brennan*, the Supreme Court made clear that prison officials have a duty under the Eighth Amendment to take reasonable steps to insure the safety of inmates, which includes harm perpetrated on one inmate to another. 511 U.S. 825 (1994). And the Seventh Circuit Court of Appeals expounded on *Farmer* in *Pope v. Shafer* in 1996, clearly outlining both the objective and subjective standard for an Eighth Amendment failure to protect case. 86 F.3d at 92.

Consequently, Defendants are not entitled to qualified immunity on Plaintiff's claim against Defendants for failing to protect him from an attack by his cellmate.

## Conclusion

The motion for summary judgment (Doc. 80) is **DENIED in part and rendered MOOT in part**. It is **DENIED** with respect to Count 1, which is Plaintiff's Eighth Amendment deliberate indifference claim against Sergeant Groves, Lieutenant Wall, and Warden Love. It is **MOOT** with respect to Count 2 against Warden Thompson because Plaintiff opted to dismiss Count 2 in response to Defendants' motion for summary judgment, thus rendering Defendants' request for summary judgment on Count 2 moot.

The Court will set this case for a status conference by separate notice to discuss the referral of this case for mediation or a settlement conference and to discuss trial scheduling.

**IT IS SO ORDERED.**

**DATED: March 9, 2023**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**